**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN LEE, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>              v.<br><br>FUBOTV INC., DAVID GANDLER, EDGAR M. BRONFMAN JR., and SIMONE NARDI,<br><br>                                    Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Steven Lee ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against FuboTV Inc. ("Company" or "Fubo") and David Gandler ("Gandler"), Fubo's Co-Founder, Chief Executive Officer ("CEO") and director; Edgar M. Bronfman Jr., ("Bronfman"), Fubo's Executive Chairman; and Simone Nardi ("Nardi"), Fubo's Chief Financial Officer ("CFO") (collectively, "Individual Defendants," and together with the Company, "Defendants"), based upon, inter alia, the investigation conducted by counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company and other information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and the Individuals Defendants. The Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Fubo stock between March 23, 2020 and January 4, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Founded in 2015, Fubo is a Florida corporation headquartered in New York.  Fubo is a multichannel video programming distributor ("vMVPD"), offering subscribers access to thousands of live sporting events as well as news and entertainment content.  Fubo's platform allows customers to access content through streaming devices, and on SmartTVs, mobile phones, tablets and computers.  It streams its services to United States, Canada and Spain.  In its regulatory filings and public statements, Fubo positions itself as a content distributor at the intersection of three "megatrends": cord-cutting, connected TV advertising, and online sports wagering.  Fubo revenues are almost entirely derived from the sale of subscription services and advertising in the United States.

3.      During the Class Period, Defendants disseminated false and misleading statements that misrepresented Fubo's financial health and its operating condition.  These misleading statements included representations relating to a variety of Fubo's business operations and performance metrics, including, among others, Fubo's ability to grow subscription levels and future profitability, seasonality factors, cost escalations and potentially shrinking addressable market, ability to attract and generate advertising revenue, the Company's valuation, and its prospects of entering the arena of online sports wagering.  For example, one of the Company's unrealistic promises included courageous claims of the Company's plans to scale its sport wagering business by, among other things, acquiring Balto Sports, which significantly inflated the price of Fubo securities, and also created a false basis for its valuation and revenue projections.  In reality, the Company's prospects of scaling the sports wagering business was far from realistic given its size and market share, a fact that investors were never apprised of.  As some analysts later described Fubo's strategy, it amounted to "putting a lipstick on a pig."

4.      Investors learned the truth gradually through a series of research reports beginning on December 23, 2020.  Those reports revealed, among others things, that (i) Fubo's growth in subscriber and profitability was unsustainable past the one-time seasonal surge; (ii) Fubo's offering of products would be subject to cost escalation; (iii) Fubo could not successfully compete and perform as sports book operator and could not capitalize on its online sports wagering opportunity; (iv) Fubo's data and inventory was not differentiated to allow Fubo to achieve its long-term advertising growth goals; (v) Fubo's valuation was overstated in light of its total revenue and subscription levels; and (vi) the acquisition of Balto Sports did not provide the stated synergies and internal expertise, and did not expand the Company's addressable market into sports wagering.

5.      Upon the publication of the research reports, the price of Fubo securities declined 54% from a close of $52.59 on December 23, 2020 to a close of $24.24 on January 4, 2021.  As a result of Fubo's wrongful acts and omissions, and the precipitous decline in the market value of Fubo's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

8.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District.  Pursuant to

Fubo's most recent quarterly report (SEC Form 10-Q), as of November 11, 2020, there were 67,533,800 shares of the Company's common stock outstanding. Fubo's common stock trades on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Fubo's common stock located within the U.S., some of whom undoubtedly reside in this judicial district.

9.      In connection with the acts alleged in this Complaint, Fubo, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

10.      Plaintiff is a resident of Maple Grove, Minnesota. As set forth in the attached Certification, incorporated by reference herein, Plaintiff acquired Fubo shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.      Defendant Fubo is a Florida corporation with a principal place of business at 1330 Avenue of the Americas, New York, NY 10019. Fubo shares trade on the NYSE under the ticker symbol "FUBO."

12.      Defendant Gandler is the co-founder of the Company and has served as the Company's CEO and a director since April 1, 2020.

13.      Defendant Bronfman has served as the Company's Executive Chairman since April 29, 2020.

14.      Defendant Nardi has served as the Company's CFO since May 31, 2020. Defendant Nardi served as Interim Chief Financial Officer since March, 2020.

15.    Defendants Gandler, Bronfman, and Nardi are sometimes referred to herein as the "Individual Defendants." The Individual Defendants, together with Fubo, are sometimes referred to herein as the "Defendants."

16.    The Individual Defendants possessed the authority to control the contents of statements made by Fubo in the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their positions with Fubo, and their access to Fubo's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### A.    Industry and Company Background

17.    Virtual Multichannel Video Programming Distributors ("vMVPDs"), like Fubo, aggregate live and on-demand television content for delivery over the internet. Unlike traditional cable TV or satellite providers, Fubo does not supply its own data transport infrastructure (e.g., the cable) and instead relies on subscribers to maintain their own internet connection to access its service. vMVPDs offer service and product bundles to subscribers offering channels at a lower monthly rate than offered by traditional cable/satellite providers. There currently are 271 online video services vMVPDs that provide viewers with content from broadcast and cable network as well as streaming providers. Internet-based streaming services and corresponding distribution

platforms have progressed at a staggering pace, allowing for faster and cost-effective transmissions. According to industry experts, nearly six million subscribers dropped their traditional pay TV services in the third quarter of 2019 alone. In light of this trend, companies sought to capitalize the new market.

18.     In recent years, platforms like Fubo have gained popularity over legacy set-top cable boxes, as a way to view live TV. For example, Dish Network first introduced its service known as "Sling TV" in 2015, through which it offered a selection of popular cable networks delivered via mobile apps and other digital media players, or over the internet. By 2018, AT&T, Hulu, Sony and YouTubeTV had all entered the market. S&P Global Markets Intelligence media research group reports that the number of virtual multichannel service households will hit 15.3 million by the end of 2022.

19.     Founded in 2015, Fubo is a sports-first vMVPD offering subscribers access to thousands of live sporting events as well as news and entertainment content. First launched as a soccer streaming service, Fubo changed to an all-sports service in 2017 and then to its current vMVPD format. Fubo's streaming service is available in the United States, Canada and Spain and consists of different subscription plans offering different channel packages. In its regulatory filings and public statements, Fubo positions itself as a content distributor at the intersection of three "megatrends": cord-cutting, connected TV advertising, and online sports wagering. Fubo revenues are almost entirely derived from the sale of subscription services and advertising in the United States.

20.     In March 2020, Fubo announced that it has agreed to merge with FaceBank Group Inc. ("FaceBank"), a leading virtual entertainment company, focused on development, protection and activation of the personal digital likeness assets of celebrities and consumers, for use in

artificial intelligence, entertainment, personal productivity and social networking.[1]  Pursuant to the merger agreement between FaceBank and Fubo, Fubo became a wholly owned subsidiary of FaceBank and FaceBank was renamed to FuboTV Inc.  Through this merger, completed on April 1, 2020, Fubo "obtained a secured revolving line of credit of $100 million" for the benefit of FuboTV as an "inducement to the willingness of the FuboTV" to enter into the merger agreement. At the time of the merger, FaceBank's stock was traded over-the-counter under the ticker "FUBO."

### B.     Materially False and Misleading Statements Issued During the Class Period

21.     On March 23, 2020, Fubo issued a press release, attached to Fubo's 8-K filing with the SEC the same day, entitled *Facebank Group And FuboTV Announce Definitive Merger Agreement - Combined Company To Be Named FuboTV, Inc*., which quoted Defendant Gandler stating the following, in relevant part, regarding the Company's capabilities:

> The business combination of FaceBank Group and fuboTV ***accelerates our ability to build a category defining company and supports our goal to provide consumers with a technology-driven cable TV replacement service for the whole family***. With our growing businesses in the U.S., and recent beta launches in Canada and Europe, ***fuboTV is well-positioned to achieve its goal of becoming a world-leading live TV streaming platform for premium sports, news and entertainment content. In the current COVID-19 environment, stay-at-home stocks make perfect sense*** - we plan to accelerate our timing to uplist to a major exchange as soon as practicable. We look forward to working with John and his team of creative visionaries.[2]

22.     On April 2, 2020, FaceBank Group and Fubo issued joint press entitled *FaceBank Group and fuboTV Announce Completion of Merger - Combined Company to Be Named fuboTV, Inc.,* which quoted Defendant Gandler, stating the following, in relevant part, regarding the Company's capabilities:

---

[1]     FaceBank's prior name was Pulse Evolution, which gained popularity for computer-generated holographic images of Tupac Shakur at 2012 Coachella and Michael Jackson at the 2014 Billboard Music Awards.  Pulse technology also was used for VFX in such movies as "The Curious Case of Benjamin Button," "Star Wars: Episode III – Revenge of the Sith," "Rango" and "Transformers."

[2]     Unless otherwise noted, all emphasis herein and hereinafter is added.

With today's closing, fuboTV is well-positioned to redefine the virtual MVPD space. Technology-driven cable TV replacement services are more important than ever, especially at this time when people are staying safe at home watching television for needed information, entertainment and escape.

23.     On May 29, 2020, Fubo—still operating under the name FaceBank Group, Inc.— filed its yearly report on Form 10-K with the SEC for the fiscal year ended December 31, 2019 (the "2019 Annual Report"). The 2019 Annual Report was signed by Defendants Gandler and Bronfman. Appended as Exhibits 32.1 and 31.2 to the 2019 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein Defendant Gandler certified that "the [2019 Annual Report] does not contain any untrue statements of a material fact" and that "the information included in the [2019 Annual Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

24.     The 2019 Annual Report touted the synergies that the combination between FaceBank Inc. and Fubo purportedly created, stating as follows:

The Company is a leading digital entertainment company, combining fuboTV's direct-to-consumer live TV streaming platform with FaceBank's technology-driven IP in sports, movies and live performances. ***This business combination, operating as fuboTV, Inc., will create a content delivery platform for traditional and future-form IP. fuboTV plans to leverage FaceBank's IP sharing relationships with leading celebrities and other digital technologies to enhance its already robust sports and entertainment offerings.***

Since the Merger, while we continue our previous business operations, we are principally focused on offering consumers a leading live TV streaming platform for sports, news and entertainment through fuboTV. fuboTV revenues are almost entirely derived from the sale of subscription services and advertising in the United States, though fuboTV has started to assess expansion opportunities into international markets, with operations in Canada and the launch in late 2018 of its first ex-North America offering of streaming entertainment, to consumers in Spain.

25.     The 2019 Annual Report also stated that the following regarding the Company's Critical Accounting Policies:

_Acquisitions and Business Combinations_

**The Company allocates the fair value of purchase consideration issued in business combination transactions to the tangible assets acquired, liabilities assumed, and separately identified intangible assets acquired based on their estimated fair values.** The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. Such valuations require management to make significant estimates and assumptions, especially with respect to intangible assets. Significant estimates in valuing certain intangible assets include, but are not limited to, future expected cash flows from, acquired technology, trade-marks and trade names, useful lives, and discount rates. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, which is one year from the acquisition date, we may record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.

26.     On July 6, 2020, Fubo (under the name FaceBank) filed its quarterly report on SEC Form 10-Q for the first fiscal quarter 2020 ("1Q 2020 Report").  Appended as Exhibits 32.1 and 31.2 to the 1Q 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, respectively, certified that "the [1Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [1Q 2020 Report] fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

27.     In connection with the 1Q 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results, as well as a letter to shareholders released on July 8, 2020 from Defendant Gandler.  In the letter to shareholders, Defendant Gandler stated, regarding Fubo's strategy and focus:

*We believe fuboTV is at the forefront of the streaming revolution and has a significant advantage not only over peers in the vMVPD space but also over traditional cable television.* We offer cord-cutters a total cable TV replacement with top Nielsen-ranked sports, news and entertainment channels. *What sets fuboTV apart is our internally built tech stack that keeps us innovating ahead of the industry.* With premium features like 4K streaming, personalized live TV recommendations and recent app updates that integrate live video into the product experience, *we believe a fuboTV subscription offers consumers the best value of any other live TV streaming platform.* We believe consumers will continue to choose streaming over traditional pay television because of this more personalized, premium viewing experience that is also less expensive.

fuboTV had an extremely productive Q1, despite a complete shutdown of sports, *and we have made several significant recent announcements that highlight the competitive strength of our company and further differentiate us in the marketplace.* While we expect that the COVID-19 pandemic will have lasting effects on consumer behavior and live television viewing, vMVPDs are also a more affordable alternative to pay TV, which, we believe, in this current economic climate, further accelerates adoption. *We believe we are well positioned as a leader in the industry.*

28.    On August 10, 2020, the Company changed its name to fuboTV Inc. and as of May 1, 2020, the Company's trading symbol was changed to "FUBO."

29.    On August 13, 2020, Fubo filed its quarterly report on SEC Form 10-Q for the second fiscal quarter 2020 ("2Q 2020 Report").  Appended as Exhibits 31.1 and 31.2 to the 2Q 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, respectively, certified that "the [2Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [2Q 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

30.    In connection with the 2Q 2020 Report, the Company issued a press release, summarizing the Company's financial and operational results.  The press release quoted Defendant Gandler, stating:

11

We believe consumers will continue to choose streaming over traditional pay television, especially in the current economic climate because of its more personalized, premium viewing experience. ***Macro trends towards streaming, combined with our strong second quarter results and continued momentum, reinforce our confidence in our business and the vMVPD space.*** Looking ahead to Q3, with the gradual return of sports, we anticipate an increase in subscribers, viewership and that our portion of revenue derived from advertising will grow. At the close of Q3 we expect paid subscribers to reach 340,000 - 350,000, which will be an increase of 20% year-over-year. The growth of streaming is one of the most significant changes to television, and television advertising, in the last several decades. ***fuboTV is at the forefront of the streaming revolution and we are excited for existing and new investors to join us on this journey.***

31.    Also in connection with the 2Q Report, the Company furnished a letter to shareholders dated August 13, 2020 from Defendant Gandler.  In the letter to shareholders, Defendant Gandler reiterated that Fubo was "at the forefront of the streaming revolution," and also providing the following summary:

> The strength of the streaming business during the pandemic is a clear sign that vMVPDs have a bright future. fuboTV's solid second quarter validated our belief that consumers are seeking lower cost alternatives to traditional television. Our streaming hours grew over the prior year despite a near total shutdown of sports. This is primarily a result of fuboTV's expanded programming offering for the entire family combined with product innovations that deliver a premium viewing experience not available through traditional television. We expect streaming hours to grow as sports return.

32.    On September 15, 2020, the Company furnished another letter to shareholders addressed from Defendant Gandler, in which Defendant Gandler stated, regarding Fubo's business model and future growth strategy:

> ***[W]e continue to believe fuboTV is at the forefront of the streaming TV revolution. fuboTV is the leading sports-first, live TV streaming platform,*** offering subscribers access to tens of thousands of live sporting events annually as well as leading news and entertainment content. We offer a broad mix of 100+ channels, including 43 of the top 50 Nielsen-ranked networks across sports, news and entertainment (Primetime A18-49), making fuboTV a leading cable TV replacement product for the entire household. Our retention rate has remained high during the pandemic as customers have found a diverse range of content on the platform to satisfy their needs.

***At the core of our offering is our proprietary technology platform optimized for live TV and sports viewership.*** Our proprietary technology stack has enabled us to regularly offer new features and functionality. For example, we were the first virtual multichannel video programming distributor (vMVPD) to stream in 4K resolution. We also offer multi-view on Apple TV, which enables subscribers to watch two live streams simultaneously, as well as the ability to watch select sports content from multiple camera angles.

*    *    *

***Furthermore, we believe fuboTV's sports package is unparalleled in the marketplace.*** fuboTV offers more than 50,000 live sporting events each year and is the only vMVPD streaming 11 Thursday Night Football (FOX) games in 4K this season. The start of the NFL season has been significant for fuboTV. It's been widely publicized that television ratings declined nearly 13% for the NFL's 2020 Kickoff Game on Thursday, September 10. fuboTV, on the other hand, has achieved record viewership with our NFL carriage. ***On Sunday, September 13, our viewing hours doubled year-over-year and reached one million hours for the first time. Cord-cutters are clearly embracing streaming platforms for sports viewing.***

33.    Defendant Gandler summarized Fubo's performance and strategy, stating: "fuboTV continues on the path of solid growth with double digital revenue and subscriber increases year-over-year [and are] confident in the continued strength of our business . . ."

34.    On August 11, 2020, Fubo filed with the SEC a Registration Statement on Form S-1 signed by Defendants Gandler, Nardi, and Bronfman, relating to the proposed follow-on public offering of its common stock.  On September 15, 2020, October 1, 2020, and October 5, 2020, Fubo filed revised versions of the Registration Statement on Forms S-1/A, each of which was signed by Defendants Gandler and Nardi.  On October 7, 2020, the Registration Statement was declared effective by the SEC.  The Registration Statement was incorporated into and formed part of the Prospectus filed on October 9, 2020.

35.    Fubo offered to sell to the public 18.3 million common shares (excluding the underwriters' option to purchase an additional 2.75 million common shares), for $10 per share. FuboTV closed its public offering of 19,706,708 common stock on October 13, 2020, including the full exercise of the underwriters' option, generating $197 million in gross offering proceeds.

36. The Prospectus Summary contained materially false and misleading statements relating to Fubo's business model, stating:

> Our business model is 'come for the sports, stay for the entertainment. ***This translates to leveraging sporting events to acquire Subscribers at lower acquisition costs, given the built-in demand for sports. We then leverage our technology and data to drive higher engagement and induce retentive behaviors such as favoriting channels, recording shows, and increasing discovery through our proprietary machine learning recommendations engine. Next, we look to monetize our growing base of highly engaged subscribers by driving higher average revenue per user (ARPU)***.

37. The Registration Statement identified Fubo's "Competitive Strengths," which purportedly contributed to Fubo's past revenue and subscriber growth:

**Our Competitive Strengths**

We believe that fuboTV Pre-Merger's revenue and subscriber growth are a result of the following competitive strengths:

- **Comprehensive Sports, News & Entertainment Offering**. While we continue to attract consumers with our extensive premium sports content, we believe our increasingly broad and deep news and entertainment content offerings enhances total viewership and retention of our users as a pay TV replacement. We believe we will continue to optimize our content offering by identifying and executing strategic deals that best suit our consumers' preferences.

- **Delivering Significant Value to Our Subscribers.** We seek to provide a flexible product offering, delivering leading bundles for consumers that best meet their target price point. fuboTV's base package is less expensive than traditional cable or satellite options and includes a broad array of 100+ channels across sports, news and entertainment.

- **Proprietary Technology and First-Party Data.** Because we design, develop and operate all core segments of our platform, we are able to capture and analyze how our subscribers engage our offering. These unique data insights allow us to better understand and continually adjust our product and strategy to better meet the needs of our subscribers.

- **Intuitive User Experience.** We are continuing to innovate to give subscribers a premium viewing experience that they are unable to find with cable TV and are regularly first-to-market with new product features. Our product is highly customizable and provides an optimized experience for

personalized live streaming, including capabilities such as unique user profiles, multiple angle and screen viewing for sports, favorites lists, a dynamic recommendation engine and Cloud DVR offerings.

- **Efficiency of Cloud-based OTT model.** fuboTV's capital-efficient cloud-based OTT model doesn't require us to devote capex to procuring, maintaining inventory of and delivering superfluous, and often outdated, proprietary set-top boxes to customers that do not want or need them. Furthermore, our proprietary technology infrastructure is highly scalable, which we expect to provide ongoing cost and margin advantages as we grow.

38.    Regarding the Company's growth, the Registration Statement provided, in relevant part:

Our growth strategy is to acquire subscribers who are attracted to our premium sports offering and can find with us a compelling sports, news and entertainment viewing alternative to a traditional pay TV service. We actively engage those subscribers by providing a seamless pay TV replacement through a personalized easy-to-use streaming product at a significantly lower cost than traditional pay TV providers. We then monetize our engaged audience through subscription fees and our digital advertising offering. ***Today, the vast majority of our revenue is generated from monthly subscriptions. We have improved our margins, as well as our engagement levels,*** by enabling subscribers to select attachments such as Cloud DVR Plus and Family Share and to subscribe to premium channel packages like Sports Plus with NFL RedZone and International Sports Plus. ***We believe a significant opportunity for fuboTV is to allow advertisers to access our audience by leveraging our technology, data, and measurability to drive returns on advertising spend.***

39.    Rather than disclose the truth, the Registration Statement highlighted the Company's purported success in growing advertising revenue, stating, in pertinent part:

***Advertisers***

We believe our leading, independent live TV streaming platform offers a unique opportunity to advertisers. As cord cutting continues and traditional linear TV viewers decline, advertisers are increasingly allocating their ad budgets to OTT platforms to reach these audiences. fuboTV's sports-first live TV platform offers advertisers a growing and increasingly valuable live audience and provides un-skippable ad inventory on high quality content. We believe our growing subscriber base and increasing household viewing hours makes the platform highly attractive to advertisers. Advertisers also benefit from combining traditional TV advertising

15

formats with the advantages of digital advertising including measurability, relevancy and interactivity.

40.     The Registration likewise stated: "We believe our premium content and industry-leading consumer experience uniquely position us to rapidly grow our advertising business."

41.     On November 10, 2020, Fubo issued a press release announcing the results of its financial performance for its third fiscal quarter ended September 30, 2020.  The press release touted the Company's results, stating that the Company "delivered the strongest quarter in its history and exceeded previously raised guidance with solid growth in revenue, subscription and engagement."  Defendant Gandler reiterated these courageous claims, stating that Fubo had "the strongest quarter in FuboTV's history, exceeding targets in all of [its] key metrics."  Similarly, Defendant Bronfman echoed these positive sentiments, claiming that:

> We believe that fuboTV sits firmly at the intersection of three megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering, a market which we intend to enter. ***As a result, we believe our growth opportunities are numerous. Our optimism in the future of fuboTV and the live TV streaming business has never been stronger.***

42.     In a letter to shareholders, signed by Defendant Bronfman and released on the same day, November 10, 2020, the Company touted its "proprietary data and technology platform" as purportedly being the key to its success and future growth, stating, in relevant part:

> ***Our financial model is driven by strong unit economics. We expect margin improvement to continue over time, aided by a number of initiatives. This includes the growth of advertising on our platform along with strong attachment rates on value-added services,*** such as cloud DVR storage and the ability to stream on multiple devices.
>
> We believe fuboTV sits firmly at the intersection of three industry megatrends: the secular decline of traditional TV viewership, the shift of TV ad dollars to connected TVs and online sports wagering. ***Our strong subscriber growth indicates consumers are cutting the cord faster than ever before, and our increased viewer engagement has driven fuboTV's ad sales growth.*** We've previously said that we see the online wagering space - a market expected to reach $155 billion by 2024 according to Zion Market Research - as complementary to our sports-first live TV

16

streaming platform. We believe there is a flywheel opportunity with video content and interactivity. As our cable TV replacement product is sports-focused, we believe a significant portion of our subscribers would be interested in online wagering, creating a unique opportunity to drive higher subscriber engagement and open up additional revenue opportunities. Simply put, we expect wagering will lead to more viewing, and this increased engagement will lead to higher ad monetization, better subscriber retention and a reduction in subscriber acquisition costs.

Therefore, we are excited to announce that fuboTV intends to expand into the online sports wagering market. ***Our goal with wagering is to develop a new revenue stream for fuboTV, and one which we believe will be an important contributor to our business.***

We expect to share more tactical details as appropriate. And, of course, we expect to continue to grow our subscribers which will positively impact any decision we make on wagering.

43.     As to FuboTV's financial performance, the letter to shareholders provided certain financial highlights, including information pertaining to its subscription rate and growth, stating, in relevant part:

- [The Company's] revenues for the third quarter 2020 were $61.2 million, a 47% increase year-over-year on a pro forma basis, or +71% excluding licensing revenue from FaceBank AG. This growth ahead of guidance, was driven by continued subscriber expansion, an increase in subscription Average Revenue Per User (ARPU) and growth of advertising sales:

  - Subscription revenue increased 64% year-over-year to $53.4 million.
  - Advertising revenue increased 153% year-over-year to $7.5 million.

- Paid subscribers at quarter end totaled 455,000, an increase of 58% year-over-year.

- Average Revenue Per User (ARPU) per month was $67.70, up 14% year-over-year.

- Total content hours streamed by fuboTV users (paid and free trial) increased 83% year-over-year to 133.3 million hours.

- Monthly active users (MAUs) watched 121 hours per month on average in the quarter, an increase of 20% year-over-year.

* * *

- We use adjusted contribution margin to measure the variable costs against subscriber revenue: adjusted contribution margin was positive 16.1% in Q3 2020, up from 0.5% in Q3 2019. ***The improvement was driven by growth in subscription ARPU, growth in advertising ARPU and a reduction in the average cost per user (ACPU), mainly driven by lower per-subscriber content expenses.*** Q3 2020 adjusted contribution margin benefitted in part from the unusual timing of some content deal negotiations in July. Adjusted for this unusual, one-time impact, the Q3 2020 adjusted contribution margin would have been approximately 10.5%. Please refer to the reconciliation of revenue to adjusted contribution margin in the non-GAAP information in the tables accompanying this letter.

44.     As to it's the financial guidance, Fubo raised its Q4 guidance, stating that it expected "Q4 revenues to be $80-85 million, a 51% to 60% increase year-over-year. We also expect to end the fourth quarter with 500,000-510,000 paid subscribers, an increase of 58% to 62% year-over-year."  Additionally, FuboTV represented that expected full year 2020 revenue to be "$244-248 million, an increase of over 65% year-over-year."  And its full year 2021 revenue to be "$415-435 million, an increase of over 70% year-over-year."

45.     The letter to shareholders ended with a summary of the Company's claims of future revenue and subscription growth and promising growth of advertising, stating, in relevant part:

> The growth of advertising on our platform along with strong attachment rates on value-added services, such as cloud DVR storage and the ability to stream on multiple devices, continue to improve margins. Furthermore, we believe fuboTV's differentiation in the marketplace - sports-focused programming and a tech-first user experience - firmly positions the company for long-term growth. We are also excited about the potential growth and revenue opportunities around our intended expansion into online sports wagering.

46.     On the same day, November 10, 2020, the Company hosted an earnings call with the analysts to discuss its financial results and operations.  During the call, Defendant Gandler touted the Company's results, stating as follows:

> And from an execution standpoint Q3 was by far the strongest quarter in the company's history. Our results have exceeded previously raised guidance with solid

growth across every KPI we track. Revenues were up 47% to $61 million, that's well ahead of the guidance range we provided $52 million to $55 million. Our business is really comprised of two components. Subscription revenue which was up 64%, and advertising revenue, which was up in amazing 153%. Ad revenue for the quarter exceeded 12%, and to put that into context 2019 Ad revenue represented roughly about 8%.

So you can see why we're so excited about the quarter and about our guidance in Q4 and for full-year 2021. Paid subscribers are quite a rental the 455,000 and that's 58% above the 288,000 last year. Net additions came in at 167,000 that's up almost 100% year-over-year.

*          *          *

And advertising sales, which I've already highlighted earlier, clearly plays an important role in margin expansion. At the end of the day, we made some really bold moves in the quarter and that really speaks to our ability to leverage our proprietary data. And so it also speaks to our the quality of our execution. As you all know, it's tough to expand margins while growing your sub base at this current pace.

47.     Regarding the Company's future growth, Defendant Gandler assured investors that Fubo was positioned for future growth due to tailwinds from "three mega trends":

> ***The tailwinds have never been stronger. Fubo is firmly at the intersection of three mega trends. The first is the secular decline of traditional television viewership. The second is the shift of TV ad dollars to connect the devices. And the third is online sports wagering a market we absolutely intend to enter.***
>
> ***Our growth opportunities are numerous, and there are a great many reasons for us to be optimistic given the optionality in the business.*** Since some of you are new to the story, it might be helpful for me to provide a quick background on who we are. In 2015, we found it Fubo introducing a live streaming platform to serve the needs of U.S. soccer fans, that we're unable to watch international soccer leaks. We quickly learned the soccer fans wanted three things: they wanted a greater breadth of sports and entertainment content; they wanted an intuitive user experience; and they, of course, wanted exceptional value.

48.     Once again, Defendant Gandler touted the Company's proprietary data and technology and assured investors of improved retention, which was purportedly due to the Company's differentiated offering and personalized premium viewing experience:

Supporting our offerings is our proprietary data and technology platform that really optimized for live TV and sports, our platform has enabled us to regularly offer new features and functionality for our subscribers. To the best of my knowledge we are still the only virtual MVPD to stream live sports in 4K.

\*    \*    \*

We believe our platform offers a more differentiated, a more personalized premium viewing experience for sports fans. And that's really reflected in the recent reports highlighting customer satisfaction relative to our peers. And it also is reflected in our app ratings, and most importantly is reflected in our improving retention.

49.    In response to Evercore ISI analyst, Kevin Rippey's question regarding Fubo's plans on expanding sports gambling, Defendant Gandler represented that Fubo had "already started executing on its [wagering] strategy" and that the Company is "going to be able to also sell in a lot of wagering opportunities" given its "acquisitions advantage," "engagement advantage," and "monetization advantage."

50.    On November 16, 2020, the Company filed its quarterly report on SEC Form 10-Q for the third fiscal quarter 2020 ("3Q 2020 Report").  Appended as Exhibits 32.1 and 31.2 to the 3Q 2020 Report were signed SOX Certifications, wherein Defendants Gandler and Nardi, respectively, certified that "the [3Q 2020 Report] does not contain any untrue statements of a material fact" and that "the information included in the [3Q 2020 Report] fairly presents, in all material respects, the financial condition and results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934."

51.    On December 1, 2020, the Company issued a press release, announcing the acquisition of Balto Sports, a company that develops tools for users to organize and play fantasy sports games.  In the press release, Defendant Gandler promoted the move as "instrumental" expansion of Fubo's sports betting ambitions, stating as follows:

*We believe there are significant synergies between consumers who enjoy wagering and our subscribers who enjoy streaming live sports, creating a flywheel opportunity.* As we've previously expressed, one of our goals with wagering is to expand our total available market (TAM) by developing another important revenue stream for fuboTV, as we are doing with our growing ad sales business.

The acquisition of Balto Sports will enable us to build a first class, free to play experience that brings consumers the best games around live sports. From there, we see a natural progression to layer on real money wagering in regulated markets complementing fuboTV's live streaming video for a highly engaging user experience within our platform. We will be strategic in our approach to wagering as we consider and evaluate different opportunities and will adjust our plans accordingly. We're excited to launch sports wagering, integrate it into our core offerings and deliver what we believe will be a truly groundbreaking live TV streaming platform to consumers.

52.     On December 9, 2020, the Company participated in a BMO Capital Markets 2020 Growth & ESG Conference to give the investors updates on its performance.  During the conference, Defendant Gandler touted the Company's strategy and its use of sophisticated algorithms as purportedly responsible for the surge in viewership, stating, in relevant part:

And so what happened with fubo I think it's really important for us and this is why we have confidence in our strategy is that while we weren't able to acquire anybody, we were really able to retain a lot of people. Viewing hours have gone from something like 120, 121, 123 to about 145 hours. . . . That is an enormous amount of viewing time. So couple takeaways from there. *One is the strategy works. We were able to surface more and more content that people like* and I think you hit the nail on the head when you said some people get you at hello, we got your wife in reality TV and *I think this gave us an opportunity to continue to play with our guys to look at our machine learning algorithms and to get people to watch more, which also led to obviously a better advertising conversion.* So that's what we were focused on before the sport season came back.

53.     When asked about the acquisition of Balto Sports, Defendant Gandler promoted the acquisition, highlighting the synergies between the two companies, stating, in relevant part:

*And so we needed to make sure that this was a team that had a very specific skill set that we did not have, but yet was small enough that we can integrate into our larger group and allow them to leverage the resources and the metadata mapping and things that we think are going to allow us to really build something compelling.*

And so the reason why Balto was because again, they are in the pick'ems game, they have had, over 30,000 players test the platform. They understand automation. We understand consumer journeys. We understand what we should be looking at from conversion funnels. And what this is going to allow us to do is launch a game at the end of the, I'll call it, first half of the year 2021. Don't hold me to it, but just say call it, June. These guys are going to be joining us, I think next week finally. So we're very excited about that. We've been planning.

54.     Regarding gambling opportunities, Defendant Gandler provided conflicting commentary, stating at one point that "We're building our free to play our strategy right now. Doing all the data mapping.  Understanding which gains were and then eventually as we get into the second phase of this is where we're looking for an entry point into wagering in terms of potentially becoming a sports book."  At a different time during the conference, Defendant Gandler sought to tamp down expectations for FuboTV sports betting, stating instead, that "no one should think of us as a . . . wagering company, we're not competing with DraftKings."  The BMO analyst picked on Defendant's contradictory statements and asked point-blank whether FuboTV was looking to become a licensed real money gaming operator, to which Defendant Gandler did not commit beyond saying it was a "clear option."

55.     The Company's positive musings about the acquisition of Balto Sports' worked. Following this news, several securities analysts raised price targets and began incorporating Balto Sports' valuation into Fubo's own valuation.

56.     The above statements identified in ¶¶ 21 - 54 were materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Fubo's growth in subscriber and profitability were unsustainable past the seasonal surge in subscription levels; (ii) Fubo offering of products was subject to undisclosed cost escalations; (iii) Fubo could not successfully compete and perform as sports book operator and could not capitalize on its only sports wagering opportunity; (iv) Fubo's

data and inventory was not differentiated to allow Fubo to achieve long-term advertising growth goals and forecasts; (v) Fubo's valuation was overstated in light of its total revenue and subscription levels; (vi) the acquisition of Balto Sport did not provide the stated synergies, internal expertise, and did not expand the Company's addressable market into online sports wagering; and as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE

57.     On December 23, 2020 — following days of meteoric rise—Richard Greenfield of Lightshed Partners ("Lightshed") initiated coverage of Fubo at a sell rating and a $8 one-year price target.  In connection with initiating coverage, Lightshed called prospects of Fubo achieving success with sports betting a "pure fantasy." Lightshed further observed that the Company "[may be] the most compelling short we have ever identified in our career as analysts."

58.     On the same day, Fubo was downgraded by BMO Capital Markets to "market perform" from "outperform," noting that Fubo "valuation had gotten overheated" and explaining that "Fubo parted ways with WarnerMedia networks earlier this year, so it won't have a chunk of NBA regular-season games or the NCAA men's basketball tournament."

59.     On this news, the shares of the Company declined $11.9, or 21.22% over two days, to close at $44.18 on December 24, 2020.

60.     On December 27, 2020, Lightshed filed another report, titled *FuboTV is a Money Losing vMVPD, FuboTv is not Roku nor FanDuel; Sell Now,* in which Lightshed called Fubo a "money-losing virtual MVPD" and urged investors to sell Fubo securities.  Lighshed questioned whether Fubo can turn its "fundamentally flawed MVDP/vMVPD business into a good one, especially if it lacks scale and other product bundles."  Citing an "army of retail investors" as the

reason for the gain in the stock's popularity, Lightshed further rejected Fubo's differentiation theory, stating that: "Fubo is not Netflix, Fubo is not Flutter/FanDuel, DraftKings nor even Penn/Barstool Sports, Fubo is not Roku and Fubo is not Trade Desk.  Fubo is simply just another virtual multichannel video programming distributor (vMVPD) facing the same obstacles and financial challenges as every other vMVPD."

61.     On the publication of Lightshed's second report, which harshly criticized Fubo's business model, the price of Fubo shares declined $5.24, or 11.86%, to close at $38.94, on December 28, 2020.

62.     On December 28, 2020, the barrage by securities analysts continued with Hedgeye analyst, Andrew Freedman, questioning the Company's valuation on the grounds that "a more bullish scenario with 1.5M paid subscribers, $100 ARPU, and 15% adjusted EBITDA margin still only gets the stock up to $23/share."

63.     On this news, Fubo's shares declined additional 0.51%, to close at $38.74 on December 29, 2020.

64.     Fubo's shares continued its downward spiral on December 30, 2020, when Kerrisdale Capital published a report titled "fuboTV Inc. (FUBO), Requiem for a Stream ("Kerrisdale Report"), which comprehensively dismantled all aspects of Fubo's business model and exposed Fubo's flawed strategy.  More specifically, the Kerrisdale Report attacked Fubo's core subscription business as "structurally unprofitable," due to "high variable content costs with contracted escalators," which burdened revenue stream and prevented Fubo from ever making any money.

65.     The Kerrisdale Report sided with other securities analysts in criticizing Fubo's valuation as "absurd" given the size of its core subscription business and its "flimsy valuation

comparison" to Roku, which, unlike Fubo, has an immense range of content with dominant market share.

66.    The Kerrisdale Report further revealed that Fubo "does not have any data or inventory that is differentiated and cannot provide the reach many advertisers crave."  The Kerrisdale Report explained that connected TV, which is the source of advertising revenue, has been on a decline in the past two years with a massive increase in ad inventory being anticipated in the coming years.  Fubo, having "nothing to differentiate itself [and] levers pull to meaningfully improve its pricing," has no ability to sell more advertising.

67.    The Kerrisdale Report also criticized Fubo's acquisition of Balto Sports as a "foolish" attempt to enter the "already highly competitive space [of sport wagering]."  The Company used sports betting as bait for the investors by announcing that "fuboTV intends to expand into online sports wagering market" in its November 10, 2020 Letter to Shareholders but then acquiring Balto Sports, "a company with 3 employees," "no valuable IP," and "a failed test product" that "had mothballed operations during the pandemic."

68.    The Report questioned the Company's strategy: "dropping content to manage costs is reactionary and destined to cause eventual spikes in churn and SAC.  All Fubo can do is continue to raise price, take on more and more expensive tiers, thereby shrinking its addressable market." According to the Report, Fubo's large increase in new sign-up activity was due to resumption of sporting activity [after it was halted due to COVID-19 Pandemic] and the U.S. presidential election, and those numbers will not be repeated.  As per the Report, Fubo app download data suggests gross additions have collapsed since Election day and sit at a flat level compared to last year.

69.    On the publication of the Kerrisdale Report, Fubo shares declined another $9.7, or 25.72%, to close at $28.00 on December 31, 2020, on unusually high trading volume.

70.    Then, on January 4, 2021, Motley Fool published an article titled *There's a Big Problem with FuboTV Stock* with a subtitle "The wildly unprofitable streamer tries to put lipstick on a pig with a creative metric."  The Motley Fool article questioned the Company's business model, stating that the Company is "nowhere close to turning a profit" as "direct costs of delivering its service are higher than revenue."  Relatedly, the article noted that "subscriber related expenses, which include affiliate distribution rights and cloud computing charges, among other things, were slightly higher than revenue in the third quarter."

71.    The Motley Fool article also questioned Company's other financial metrics including Non-GAAP adjusted contribution margin, which Fubo reported to be 16.1%, and accused Fubo of "concoct[ing] a profitability metric that's positive," concluding:

> It should now be pretty clear that fuboTV's adjusted contribution margin is a meaningless number. It's a function of how quickly the company is gaining subscribers, not a representation of profitability. The fact that the company reports such a misleading metric is a huge red flag. It's reason enough to stay far away from the stock

72.    On this news, Fubo shares declined additional $3.99, or 14%, to close at $24.24 on January 4, 2021.

## **CLASS ACTION ALLEGATIONS**

73.    Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired Fubo shares during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

74. The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, Fubo shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Company's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

76. Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

77. Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Fubo and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about the financial condition, operations and oversight of operations at Fubo;

- whether Fubo and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Fubo's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Fubo shares during the Class Period were impacted by Fubo's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

78.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

79.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Fubo and the Individual Defendants.

80.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE
### FRAUD ON THE MARKET DOCTRINE

81.    The market for Fubo shares was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose,

Fubo's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Fubo shares and market information relating to Fubo and have been damaged thereby.

82.     During the Class Period, the artificial inflation of Fubo's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Fubo's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Fubo's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Fubo shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Fubo shares at such artificially inflated prices, and each of them has been damaged as a result.

83.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Fubo and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Fubo shares were traded on the NYSE and were covered by numerous analysts;

- Fubo shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Fubo shares; and

- Plaintiff and Class members purchased and/or sold Fubo shares between the time Fubo and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

84.     As a result of the foregoing, the market for Fubo shares promptly digested current information regarding Fubo from all publicly available sources and reflected such information in Fubo's share price.  Under these circumstances, all purchasers of Fubo's shares during the Class Period suffered similar injury through their purchase of Fubo's shares at artificially inflated prices. Thus, a presumption of reliance applies.

85.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

86.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose — positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

87.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

88.    During the Class Period, Plaintiff and the Class purchased Fubo's shares at artificially inflated prices and were damaged thereby.  The price of Fubo shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**NO SAFE HARBOR**

89.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Fubo and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Fubo who knew that those statements were false and misleading when made.

**SCIENTER ALLEGATIONS**

90.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Fubo and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Fubo, their control over, and/or receipt and/or modification of Fubo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fubo, participated in the fraudulent scheme alleged herein.

91.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

92.     The Individual Defendants, because of their positions with Fubo, made and/or controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Fubo's corporate statements and are therefore responsible and liable for the representations contained therein.

93.    Additionally, Defendant Bronfman was found guilty of a charge of insider trading on trades made in Vivendi Universal by a Paris Trial Court on January 21, 2011.  The conviction was affirmed by the Paris Court of Appeal in May 2014 and subsequently by the Appellate Court in April 2017.  The final judgment entered by Paris Court of Appeal ordered Defendant Bronfman to pay 2.5 million euros.  Despite being convicted of insider trading, Fubo appointed Defendant Bronfman to its Board of Directors in the capacity of Executive Chairman.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder) Against All Defendants**

94.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

95.    During the Class Period, Fubo and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

96.    Fubo and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Fubo shares during the Class Period.

97.    Fubo and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Fubo were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or

acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Fubo and the Individual Defendants, through receipt of information reflecting true facts about Fubo, their control over, and/or receipt of or modification to Fubo's allegedly materially misleading statements, which made them aware of Fubo's confidential proprietary information, participated in the fraudulent scheme complained of herein.

98.    The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Fubo, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Fubo employees to investors, including Plaintiff and Class members.   These misrepresentations and omissions were material.   A reasonable investor would consider the facts—such as the structural unprofitability of Fubo's core subscription model—important in deciding whether to buy shares of Fubo stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts.

99.    Pursuant to the foregoing, the price of Fubo shares was artificially inflated during the Class Period.  Due to their lack of knowledge of the false nature of statements made by Fubo and the Individual Defendants, Plaintiff and Class members relied on the statements made by Fubo and the Individual Defendants and/or the integrity of the market price of Fubo shares during the Class Period in purchasing Fubo shares at prices that were artificially inflated due to false and misleading statements made by Fubo and the Individual Defendants.

100.    Were Plaintiff and Class members made aware that the market price of Fubo shares was artificially and falsely inflated by misleading statements made by Fubo and the Individual Defendants, and by material adverse information that Fubo and the Individual Defendants failed

to disclose, they would not have purchased Fubo shares at artificially inflated prices, or purchased them at any price.

101.    Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

102.    Fubo and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Fubo shares during the Class Period.

## SECOND CLAIM FOR RELIEF

### (Violation of Section 20(a) of the Exchange Act)
### Against the Individual Defendants

103.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

104.    During the Class Period, the Individual Defendants were involved in the management and operation of Fubo's business affairs.  Due to their senior positions, they had knowledge of adverse non-public information regarding Fubo's business model, strategy, valuation, and revenue targets and goals and false representations in connection therewith.

105.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Fubo's financial condition and results of operations, and to correct any public statements issued by Fubo which were materially false or misleading.

106.    Due to their positions of authority at Fubo, the Individual Defendants controlled the contents of various public filings, press releases and reports which Fubo disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause Fubo to execute the wrongful acts alleged herein.  The Individual Defendants

35

were therefore "controlling persons" at Fubo pursuant to Section 20(a) of the Exchange Act.  On this basis, they were participants in the unlawful conduct alleged which caused the prices of Fubo shares to be artificially inflated.

107.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by Fubo pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.    Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

B.    Awarding damages in favor of Plaintiff and members of the Class against Fubo and the Individual Defendants, jointly and severally, for all damages sustained as a result of Fubo's wrongdoing, in an amount to be proven at trial;

C.    Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.    Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.    Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  February 24, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

36

Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*

Saturday, January 9, 2021

# fuboTV (FUBO)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against fuboTV Inc. ("fuboTV" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire fuboTV securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired fuboTV securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in fuboTV securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

**Name**

**Print Name**
Steven Lee

**Signature**

1

**Lee, Steven**                                                                    **FuboTV Inc. (FUBO)**

## List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 12/21/2020 | 90 | $50.4600 |
| Purchase | 12/24/2020 | 100 | $47.1000 |
| Purchase | 12/31/2020 | 100 | $29.4100 |
| Purchase | 12/31/2020 | 99 | $28.2800 |
| Sale | 12/22/2020 | (90) | $57.3200 |
| Sale | 12/31/2020 | (101) | $29.4800 |